UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

Case Number 04-20051-BC
Honorable David M. Lawson

DAWN L. BARTZ,

        Defendant.

_____/

**OPINION AND ORDER DENYING MOTION TO SUPPRESS EVIDENCE**

      The defendant, Dawn L. Bartz, is charged in an indictment with eleven counts of bank fraud and eleven counts of possession of stolen mail. While Bartz was in custody following her arrest, a vehicle being driven by her boyfriend was stopped and searched. Police officers discovered stolen mail, checks, and identification cards in the vehicle. During a pat down of the defendant's boyfriend, the police found currency in his pocket totaling $2,650. The defendant moved to suppress this evidence. The Court held an evidentiary hearing on June 23, 2005, at which time the Court determined that the search of the vehicle did not violate the defendant's constitutional rights and denied the motion in part. The Court allowed the parties to file supplemental briefs on the issues related to the search of Bartz's boyfriend's person and seizure of the cash. Those briefs were received, and the Court now concludes that the defendant did not have a legitimate expectation of privacy in her boyfriend's pants pocket or the seized currency; therefore, the motion to suppress evidence will be denied in its entirety.

I.

In July 2004, the Michigan State Police were called by a bank in Alpena, Michigan to investigate a complaint that certain persons passed or attempted to pass stolen and forged checks at banks and businesses in and around that city. According to the government, on July 20, 2004 an individual, allegedly the defendant, withdrew $1,500 from the account of Marvin and Geraldine Lahaie from a branch of the Besser Credit Union using a fraudulent check. The individual returned a short time later to a drive-through window and attempted to draw additional funds from the Lahaie account. The teller knew Marvin Lahaie and did not think that the individual was authorized to draw on the account, so she instructed the individual to enter the bank in order to complete the transaction. The individual fled, explaining that she had to return home to obtain her identification. On the same day, the government alleges, the defendant fraudulently withdrew the amount of $ 1,200 from another Besser Credit Union branch. The suspect was described as a white, heavyset woman with short blond hair. She drove a "bluish" minivan, possibly a Pontiac Montana, and was accompanied by one or more children who appeared to be black or mulatto.

On July 21, 2004, Bartz allegedly made another unsuccessful attempt to obtain funds from the credit union. Employees of the credit union identified Bartz as the individual who had illegally withdrawn funds the day before and called the police. A teller followed Bartz until officers could stop and arrest Bartz. The officers noted that before the arrest Bartz made a cellular telephone call from her vehicle, and they later determined that she made the call to her home. This call allegedly caused the officers concern that Bartz had given instructions to destroy evidence. Following the arrest at 3:30 p.m., officers secured the defendant's unoccupied residence and took steps to obtain a search warrant.

Bartz's residence was secured by Michigan State police officers Stephen Harshberger and Joel Jett. Harshberger was the only witness to testify at the evidentiary hearing. He said that he had been working at his office when the defendant's arrest was reported to him during the afternoon of July 21, 2004. Harshberger also learned that Bartz had a boyfriend she lived with at 9449 Kleve Road and that Bartz made a phone call at the time of her arrest.

Harshberger and Jett proceeded to the Bartz home to secure it while other officers obtained a search warrant. They were wearing plain clothes and drove Harshberger's unmarked Dodge Caravan. They arrived around 5 p.m., knocked on the door, and looked in the windows. The house appeared to be unoccupied, so Harshberger and got back into the Caravan, which was sitting in the driveway facing the road, and waited.

Harshberger was informed that Bartz's boyfriend's name was Nathan Magee, who was a black male with a criminal record that included unarmed robbery, carrying a concealed weapon, and drug offenses. Harshberger and Jett had been sitting in the driveway for twenty to thirty minutes when they saw a blue or green minivan drive by the house. A black man was driving it. Harshberger testified that the driver looked directly at him and Jett and kept driving past the house. He did not slow down or speed up and "acted as though [they] hadn't seen him." Hearing Tr. at 38.

Harshberger believed the driver of the minivan to be Nathan Magee; he explained that Bartz lives in a very rural area of south-central Alpena county, and that in Harshberger's three years of working in Alpena county he had not seen many black people in the rural part of the county. In addition, the speed at which the black man was driving and the visual contact he made led Harshberger to conclude that the driver was Magee.

-3-

Harshberger exited the driveway and began to follow the minivan. He intended to confirm that the driver was in fact Magee. Jett radioed the station to have the license plate checked, but before he got an answer and before they had turned on their overhead lights, the minivan pulled over on its own. Harshberger stated that it appeared that the driver was looking at them in his driver's side mirror.

Because the driver pulled over, Harshberger and Jett got out of their car with their guns drawn but down at their sides. They did not point the weapons at the driver or the vehicle. Harshberger had his badge attached to his belt. They identified themselves as state police officers and ordered the driver out of the vehicle. Harshberger showed the driver his identification and asked him his name, and the driver identified himself as Nathan Magee.

Harshberger said that he told Magee he was not under arrest but that he needed to pat down Magee to make sure he was not armed. Harshberger testified that Magee "didn't indicate that was any problem." Hearing Tr. at 45. Harshberger then frisked Magee for weapons and found none. He asked to see some identification, which Magee said was in his wallet in the center console of the minivan. Magee gave Harshberger permission to get his wallet from the minivan. The wallet contained a driver's license, a twenty dollar bill, phone cards, and a bridge card. When he removed the wallet from the minivan, Harshberger saw two young children in the van who appeared to be black.

Harshberger informed Magee that Ms. Bartz had been arrested for passing stolen and forged checks. He again told Mr. Magee that he was not under arrest, and he asked Magee if he would be willing to answer questions about the stolen checks. Magee agreed; he told Harshberger that Bartz owned the van, but they share it. Magee stated he knew nothing about forged or stolen checks.

Harshberger asked if he could search the van. Magee declined to give permission, stating that it was not his van. Harshberger tried to change Magee's mind by telling him that he could consent to a search because he had control of the van, but Magee again refused to allow a search. Harshberger then told Mr. Magee that they would impound the van until they got a warrant to search it. After informing Magee again that he was not under arrest, Harshberger offered to drive Magee and the children back to Ms. Bartz's home, stating however that Magee would not be permitted to reenter the minivan or the home. Harshberger testified that Magee "was fine with that." Hearing Tr. at 47.

Because Magee accepted the offer of a ride, Harshberger said he needed to conduct a more thorough pat down. He explained that Magee would be sitting behind Harshberger on the drive back, and Harshberger's vehicle did not have any barrier between the back seat and the front. Harshberger testified that Magee "had no problem to a submission of that pat down." Hearing Tr. at 48. It was during the second pat down that Harshberger touched Magee's right front pants pocket and felt "a large bulge that was soft." Hearing Tr. at 49. Harshberger believed it was "quite conceivably controlled substances." Hearing Tr. at 49.

Harshberger reached into Magee's pocket and removed the object, which turned out to be currency doubled over into a wad. He opened the money up to see if there were any drugs in the middle; there were none. Detective Harshberger stated that he learned through his experience that criminals often keep drugs in the middle of money. In addition, he needed to count the money.

When Harshberger asked Magee where the money came from, he responded that he received it as a gift from Ms. Bartz and other family members. Magee stated he was considering buying a car that was for sale nearby. Harshberger decided to keep the money as evidence.

-5-

Harshberger then drove Magee and the children back to the house. Jett drove Ms. Bartz's minivan to the house. When they arrived, Magee agreed to answer additional questions and reiterated that he knew nothing about forged or stolen checks. Magee then sat in Harshberger's vehicle as they waited for the search warrant to arrive. Magee was told that he was free to leave if he wanted, and he went to a neighbor's house.

Around 8 p.m. that night, Harshberger was notified that the search warrant had been issued. Harshberger and Jett began a search of the outside of the property and took photographs. They had been given a house key by Mr. Magee so they would not have to break the door down. Several other officers arrived on the scene, and they all entered the house using the key. Harshberger testified that no search of the minivan was commenced until the search warrant was issued. The van was then searched at the same time as the house by Lieutenant Thompson, a city police officer.

At the conclusion of detective Harshberger's testimony, the Court engaged counsel in a colloquy. Defense counsel acknowledged that in the range of police-citizen encounters, no constitutional violation results from the police talking to someone who drives past a house under surveillance and then pulls over of his own accord. Because the evidence at the hearing did not establish that the police effectuated the stop, there was no reason to analyze whether there was a proper basis to do so. *See United States v. Perez-Sosa*, 164 F.3d 1082 (8th Cir. 1998) (holding that a consensual encounter occurred, not a seizure, where the defendant pulled his vehicle over of his own accord) (cited in *Dye v. City of Warren*, 367 F. Supp. 2d 1175 (N.D. Ohio 2005)). *But cf. United States v. Hudson*, 405 F.3d 425, 438-39 (6th Cir. 2005) (holding that when the police actually do effectuate the stop, they must have an articulable basis for doing so exclusive of race). The Court concluded that when the police question a person based on reasonable suspicion of criminal activity,

-6-

the officer has a right to conduct a preliminary pat down search. *See Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000). Further, despite the allegations in the motion, the only evidence of record regarding the search of the van revealed that the vehicle was not searched until a search warrant had been obtained. Defense counsel agreed that a vehicle can be immobilized until a warrant is obtained, and the defendant does not attack the validity or execution of the search warrant.

The Court concluded that there was no basis to suppress the evidence discovered in the minivan and denied that part of the motion from the bench. An order to that effect was entered on June 24, 2005. The Court allowed the parties to brief the issue of whether defendant Bartz could challenge the search of Magee's person and seek to suppress the cash that was found in his pocket.

II.

As an initial matter, in a supplemental brief the defendant has asked the Court to reconsider its denial in part of the suppression motion as it relates to the minivan and its contents. Motions for reconsideration may be granted pursuant to E.D. Mich. LR 7.1(g) (made applicable to criminal cases by Local Rule 1.1(c) and Local Criminal Rule 1.1) when the moving party to shows (1) a "palpable defect," (2) that misled the court and the parties, and (3) that correcting the defect will result in a different disposition of the case. E.D. Mich. LR 7.1(g)(3). "A 'palpable defect' is a defect which is obvious, clear, unmistakable, manifest, or plain." *Mich. Dep't of Treasury v. Michalec*, 181 F. Supp. 2d 731, 734 (E.D. Mich. 2002) (citations omitted).

Although the defendant points to an inconsistency between detective Harshberger's hearing testimony and grand jury testimony, the Court does not believe the purported discrepancy alters its view of the facts stated at the hearing, particularly the fact that the officers did not stop Magee and

the minivan but rather Magee stopped on his own. The defendant here has not demonstrated any mistake of fact or law that amounts to a "palpable defect." Rather, she re-asserts the arguments presented earlier. The Local Rules provide, however, that any "motions for rehearing or reconsideration that merely present the same issues ruled upon by the Court, either expressly or by reasonable implication," shall not be granted. E.D. Mich. LR 7.1(g)(3). The Court will not disturb the previous ruling.

The defendant also contends that she may challenge the search of Magee's person and the seizure of the money. She argues that her joint control and supervision of the vehicle is sufficient to give rise to an expectation of privacy to challenge the search of her boyfriend. In support, she cites *United States v. Broadhurst*, 805 F.2d 849, 852 (9th Cir. 1986), a case in which the court concluded that a defendant had standing to challenge the search of premises due to "a formalized arrangement" conferring joint control and supervision over the property, although the defendant did not live on the property and was not present at the time of the search. She further contends that, because the government is asserting that she was the owner of the money seized, she had an expectation of privacy in the search, citing *United States v. Buchner*, 7 F.3d 1149, 1154 (5th Cir. 1993), in which the court held that the defendant, who was the owner of a shoulder bag found in his girlfriend's car, had a legitimate expectation of privacy with respect to the contents of the bag.

The "rights assured by the Fourth Amendment are personal rights, and . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure." *Simmons v. United States,* 390 U.S. 377, 389 (1968) (quoted in *Rakas v. Illinois,* 439 U.S. 128, 138 (1978)). Consequently, the defendant must carry the burden of establishing that her own Fourth Amendment rights were violated. *Rakas,* 439 U.S. at 132 n.1. To

do so, she must show (1) that she had a subjective expectation of privacy in the place that was searched or the items that were seized, and (2) that society is prepared to recognize that expectation as legitimate. *California v. Ciraolo,* 476 U.S. 207, 211 (1986); *United States v. King*, 227 F.3d 732, 743-44 (6th Cir. 2000); s*ee also United States v. Delgado,* 121 F. Supp. 2d. 631, 636 (E.D. Mich. 2000). It is not sufficient for the defendant to show that Magee's rights were violated by demonstrating, for instance, that the pat down search exceed its permissible scope. *See Minnesota v. Dickerson*, 508 U.S. 366 (1993). Rather, she must show that police conduct involving Magee violated her own constitutional rights by establishing her legitimate expectation of privacy in the contents of Magee's pants pocket.

In *Rawlings v. Kentucky*, 448 U.S. 98 (1980), the Supreme Court held that the defendant did not have a privacy interest in the contents of his companion's purse, in which he put illegal drugs that were seized by police. The Court reasoned:

> At the time petitioner dumped thousands of dollars worth of illegal drugs into Cox's purse, he had known her for only a few days. According to Cox's uncontested testimony, petitioner had never sought or received access to her purse prior to that sudden bailment. Nor did petitioner have any right to exclude other persons from access to Cox's purse. In fact, Cox testified that Bob Stallons, a longtime acquaintance and frequent companion of Cox's, had free access to her purse and on the very morning of the arrest had rummaged through its contents in search of a hairbrush. Moreover, even assuming that petitioner's version of the bailment is correct and that Cox did consent to the transfer of possession, the precipitous nature of the transaction hardly supports a reasonable inference that petitioner took normal precautions to maintain his privacy.

*Id.* at 105 (citations omitted). The defendant in that case also admitted that he had no subjective expectation of privacy in the purse.

Other courts have held that a defendant can claim no legitimate expectation of privacy in his companion's personal containers, such as purses or pocketbooks. *See. e.g., United States v. Rusher*,

966 F.2d 868 (4th Cir. 1992) (holding that defendant husband had no legitimate expectation of privacy in contents of wife's purse searched when vehicle was stopped for minor traffic violations); *Mabra v. Gray*, 518 F.2d 512, 513 (7th Cir. 1975) (holding that money found in wife's purse following bank robbery should not be suppressed on defendant husband's motion because, "[a]s a matter of federal law, appellant may not assert an alleged violation of his wife's Fourth Amendment rights as a basis for suppressing the evidence taken from her person"); *United States v. Glaspie*, 993 F. Supp. 448 (W.D. La. 1998) (concluding that the defendant boyfriend did not have standing to challenge the search of his girlfriend's purse). Although there can be a legitimate expectation of privacy in one's own container, *see Buchner*, 7 F.3d at 1154, it is difficult to stretch that argument to cover another person's pants pocket, particularly when that other person is wearing the pants at the time.

Nor can the defendant claim a privacy interest in the money itself, since she has not alleged that she owned it. Instead, she states "the monies seized[,] which the Government seeks to introduce in [its] case in chief[,] are alleged to be constructively owned by Dawn L. Bartz." Def.'s Supp. Brief at 3. Because the defendant has not admitted ownership of the money or submitted any evidence that she took steps to ensure that Magee would not do anything with the money, the Court finds that her suppression motion must fail because she has not shown that the search or seizure violated her own constitutional rights. *See United States v. Quinn*, 751 F.2d 980 (9th Cir. 1984).

Finally, the defendant cites no case law that supports her theory that a privacy interest in the person of another can be found in the defendant when that person borrows her vehicle and the vehicle is illegally stopped. The weight of authority, rather, is to the contrary. *See, e.g., United States v. Blanco*, 844 F.2d 344 (6th Cir. 1988) (defendant lacked standing to challenge the search

-10-

of a vehicle after renting the vehicle and turning it over to another); *United States v. One 1977 Mercedes Benz*, 708 F.2d 444, 449 (9th Cir. 1983) (owner lacked standing to challenge discovery of package in plain view inside her vehicle when she allowed another exclusive use of the vehicle and "took no precautions to safeguard any privacy interest she may have had in the automobile.") The connection between vehicle ownership and a privacy interest in Magee's pocket is too tenuous to support the claimed Fourth Amendment violation.

### III.

The Court finds that the search of the minivan did not abridge the defendant's constitutional rights, and she had no reasonable expectation of privacy in her boyfriend's person. There is no basis, therefore, to suppress the evidence found in the van or in Mr. Magee's pocket.

Accordingly, it is **ORDERED** that the defendant's motion to suppress evidence [dkt # 12] is **DENIED**.

It is further **ORDERED** that the matter will proceed to trial in accordance with the scheduling order entered October 20, 2005.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   October 25, 2005

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 25, 2005.

s/Tracy A. Jacobs
TRACY A. JACOBS

-11-